**PARK VILLAGE APARTMENTS,**
**Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 701–88C.**

United States Claims Court.

April 14, 1992.

William Robledo Edgar, Piedmont, Cal., for plaintiff.

Arnold M. Auerhan, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant. Howard Schmeltzer and Georjan Overman, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action, plaintiff, Park Village Apartments, challenges the periodic rent adjustments made by the United States Department of Housing and Urban Development (HUD) pursuant to paragraph 1.8 of plaintiff's Housing Assistance Payments (HAP) contract. Pursuant to Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (Section 8), plaintiff constructed an 84–unit, federally assisted apartment building for the elderly and handicapped. Plaintiff's HAP contract, effective May 24, 1978, obliges plaintiff to lease all 84 apartment units to eligible tenants and obliges HUD to pay plaintiff the difference between the contract rent and the amount actually paid by the low-income tenants. The contract originally established a monthly contract rent of $285 for each unit and, pursuant to paragraph 1.8, HUD is required to adjust the contract rent on an annual basis.

In the instant complaint, plaintiff contends that HUD breached its HAP contract by failing, in a variety of ways, to adjust the contract rent in the manner required under paragraph 1.8. This action is presently before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. Summary judgment is warranted if there is no genuine dispute as to any material issues of fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). For the reasons set forth below, defendant's motion is denied in part and granted in part and plaintiff's cross-motion is denied in part and granted in part.

## I.

This court discussed the calculation of periodic rent increases under HAP contracts at some length in *National Leased Housing Ass'n v. United States*, 22 Cl.Ct. 649, 658–59 (1991) (*NLHA*). Herein, paragraph 1.8 of plaintiff's HAP contract provides:

a. *Funding of Adjustments.* Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

b. *Automatic Annual Adjustments.*

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. *Special Additional Adjustments.* Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

d. *Overall Limitation.* Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

e. *Incorporation of Rent Adjustment.* Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

HUD purported to make annual adjustments to the contract rent pursuant to paragraph 1.8b. HUD periodically determined and published Automatic Annual Adjustment Factors (AAAFs) in the Federal Register and annually adjusted the contract rent based on the most recent AAAFs. HUD made the first annual adjustment in 1979.

In early 1986, plaintiff prepared a study that purported to show that rents granted by HUD pursuant to this process were materially less than the rents charged for comparable unassisted units. Apparently relying on the "Overall Limitation" provision in paragraph 1.8d, in a March 17, 1986, letter, plaintiff requested that HUD base the periodic rent adjustments upon the higher of either the AAAFs or the rents charged for comparable unassisted units. HUD denied this request. HUD interpreted paragraph 1.8d to permit consideration of comparability studies only when such studies would result in a rent *less than* a rent that would result from application of the AAAFs, *i.e.*, the requirement in paragraph 1.8d that "adjustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted units" serves only to establish a ceiling and not a floor on periodic rent adjustments. Defendant contended that to obtain an adjustment that would result in a rent higher than a rent that would result from application of the AAAFs, plaintiff was obliged to submit cost data and justify the increase pursuant to paragraph 1.8c.

## II.

In Count II of its complaint, plaintiff, in effect, contests HUD's interpretation of the "Overall Limitation" provision as creating only a ceiling and not a floor on periodic rent adjustments. Plaintiff contends, in effect, that the "Overall Limitation" provision entitles plaintiff to a rent not materially different from the rents charged for comparable unassisted units and that HUD violated this provision in establishing the rents based on the AAAFs. As a matter of contract interpretation, plaintiff is correct. The "Overall Limitation" creates both a ceiling and a floor on periodic rent adjustments.

In *NLHA*, this court analyzed the pertinent provisions of paragraph 1.8d [there found in Paragraph 1.9d] and concluded that the "Overall Limitation" provision is an independent limitation that is "paramount" to the other limitations contained in paragraph 1.8. The court explained:

Plaintiffs focus on paragraph 1.9b and stress the statement in paragraph 1.9b(2) that "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAFs] most recently published by the Government." But, while the contract provides for adjustments under paragraph 1.9b(2) plus other "special additional adjustments" under paragraph 1.9c, the contract also renders these adjustments subject to the "Overall Limitation" in paragraph 1.9d. The wording of paragraph 1.9d is straightforward: "Not withstanding any other provisions of this Contract" rent adjustments provided in paragraph 1.9 "shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government." The title "Overall Limitation" and the phrase "[n]ot withstanding any other provisions of this Contract" indicate very precisely that the limitation in paragraph 1.9d is paramount; that it overrides any other provision in the contract, including paragraphs 1.9b and 1.9c, that otherwise would result in a rent adjustment that would produce a material difference from rents charged for comparable unassisted units. Hence, the "Overall Limitation" would appear to preclude HUD's use of the most recently published AAAFs in setting the rent adjustments when the amount of such adjustments would result in such "material differences."

22 Cl.Ct. at 658–59.

*NLHA* involved a situation in which HUD, based on comparability studies, granted an annual adjustment that resulted in a rent *less than* a rent that would have resulted from application of the AAAFs. But the reasoning of *NLHA* applies equally as well when the project owner, based on comparability studies, seeks to secure an adjustment that would result in a rent *higher than* a rent that would result from application of the AAAFs. The "Overall Limitation" is "paramount" and its wording is unambiguous. The adjustment "shall not result in *material differences* between the rents charged for assisted and

comparable unassisted units" (emphasis added). *Webster's New Riverside Dictionary* (1984) defines the word "material" as "substantial" (p. 732) and defines the word "difference" as "[t]he amount by which one quantity is greater *or less* than another" (p. 376). There is no indication in the contract that the parties intended these terms to have meanings other than their commonly understood meanings. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965). Therefore, applying these dictionary definitions, paragraph 1.8 obliges that AAAF–based rent adjustments shall not result in rents substantially greater or less than the rents charged for comparable unassisted units. Defendant provides no basis in the wording of paragraph 1.8 or any logic for defining "difference" to involve a variance in only one direction.[1]

Defendant's contention that a project owner seeking a rent higher than a rent calculated from application of the AAAFs is obliged to apply for such an increase under paragraph 1.8c is simply incorrect. Paragraphs 1.8c and 1.8d are aimed at different concerns. The focus of paragraph 1.8c is the project owner's operating expenses. Paragraph 1.8c permits a project owner potentially to secure a rent increase above that resulting from application of the AAAFs in instances where the project owner is faced with increases in its operating expenses for the project. ("Special additional adjustments shall be granted … to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units. …") On the other hand, paragraph 1.8d is not concerned directly with changes in expenses but rather with differences in rents charged between the assisted units and comparable unassisted units. Expenses and rents, while related, can vary independently. For example, an owner of a project in a deteriorating neighborhood may find its expenses increasing while rents charged for comparable units in the neighborhood are decreasing. Similarly, the owner of a project in an improving area may find rents for comparable units rising much faster than any increases in its expenses. Thus, granting a rent increase under paragraph 1.8c "to reflect increases in … expenses" will not necessarily result in a rent that satisfies the comparability requirement in paragraph 1.8d. Paragraphs 1.8c and 1.8d simply offer project owners alternative routes for securing a rent increase greater than an increase that would result under the applicable AAAFs—the project owner may either present information relating to its increased costs in operating the property or, in the alternative, present information showing rents charged for comparable unassisted units.[2]

1. Defendant contends that Congress implicitly endorsed HUD's interpretation of paragraph 1.8 when in February 1988 it amended Section 8(c)(2) of the Housing Act by adding the following provision:

    If the Secretary or appropriate State agency does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under [Section 8], *the [AAAFs] shall be applied.* The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under [Section 8] (including projects assisted under [Section 8] as in effect prior to November 30, 1983), unless the project has been refinanced in a manner that reduces the periodic payments of the owner.

    42 U.S.C. § 1437f(c)(2)(C) (emphasis supplied). But this provision addresses a situation like that involved in *NLHA*, where HUD lowered rents based on its own comparability studies. It does not indicate that Congress considered and chose to address a situation where comparability studies were performed by the project owner and HUD refused to use those studies to increase the contract rent above that based on the applicable AAAFs.

2. In appropriate circumstances, paragraph 1.8c may result in a rent increase even when such an increase would not necessarily be awarded based on comparability data. The "Overall Limitation" provision precludes only *"material differences"* (emphasis added) from rents charged for comparable unassisted units. Hence, the "Overall Limitation" does not preclude a rent increase pursuant to paragraph 1.8c where the increase produces a rent higher than the rents charged for comparable unassisted units, but the difference is not "material." Such an increase can be economically valuable. As explained in *NLHA*:

    While HUD's definition of "material" has allegedly varied over the years, the definition apparently has never been so broad as to

In the absence of significant support in the wording of the HAP contract, defendant reaches outside of the contract to support its interpretation of paragraph 1.8. Defendant argues that HUD's longstanding interpretation of paragraph 1.8 is that it sets a cap on rents, not a floor, and that this court should defer to this longstanding agency interpretation. In response, first, there is no support for this alleged longstanding interpretation in the HUD regulations that were in effect at the time of the contract, and there is no suggestion that HUD communicated this internal interpretation to plaintiff prior to entry into the contract. Second, in any event, HUD entered into a contractual agreement when it executed the HAP contract. It is the unambiguous terms of the contract, not the unilateral beliefs of one of the parties, that define the parties' respective obligations. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) ("When the United States enters into contract relations, its rights and duties are governed generally by the law applicable to contracts between private individuals.")

### III.

Next, defendant presents two alternative arguments to support a conclusion that it should be granted summary judgment on Count II of plaintiff's complaint even if the phrase "material differences" is interpreted, as plaintiff proposes, to create both a cap and a floor on rent increases. First, defendant contends that plaintiff failed to exhaust an available administrative remedy for securing a higher contract rent after it completed its comparability study. Defendant contends that 24 C.F.R. § 888.204 permitted plaintiff, based on its comparability findings, to secure a higher contract rent by presenting its evidence of higher operating costs to HUD and having HUD modify the applicable AAAFs accordingly. Defendant then contends that by failing to request any revisions to the AAAFs for any of the years at issue in this

case, plaintiff failed to exhaust available administrative remedies.

But Section 888.204 does not create any mandatory procedure that a project owner must follow to secure a rent increase to which it is otherwise entitled pursuant to the "Overall Limitation." Section 888.204 provides, in pertinent part:

If the application of the [AAAFs] results in rents that are substantially lower than rents charged for comparable units not receiving assistance under the U.S. Housing Act of 1937, in the area for which the factor was published or a portion thereof, and it is shown to HUD that the costs of operating comparable rental housing have increased at a substantially greater rate than the [AAAFs], the HUD Field Office will consider establishing separate or revised [AAAFs] for that particular area. Any request for revision of the factors must be accompanied by an identification of the area.

Thus, while Section 888.204 creates one possible route for securing an upward rent adjustment, neither the contract nor the regulations make this route exclusive or otherwise oblige the project owner or HUD to take this route. Under the HAP contract, the project owner has a choice, in effect, either to submit its costs and seek an adjustment to the AAAFs pursuant to Section 888.204 or, in the alternative, to rely exclusively upon comparability data and seek an increase pursuant to the "Overall Limitation" provision. HUD similarly has authority to base a higher rent adjustment on either route. Under Section 888.204, in response to comparability studies and operating cost information, HUD will "consider" changing the applicable AAAFs, either by changing the AAAFs for the entire area or by splitting the geographic area covered by the AAAFs into smaller areas and then changing the AAAFs for only one particular area. Such a choice could benefit HUD in that it would

encompass all economically significant differences. Indeed, since 1986, pursuant to a HUD memorandum, HUD has maintained that "[a] material difference exists whenever the ad-

justed Section 8 rent would *exceed* 120 percent times the sum of the comparable rent and the initial difference" (emphasis added). 22 Cl.Ct. at 661.

avoid similar disputes with other project owners in the same area.

But Section 888.204 does not preclude HUD from instead addressing comparability disparities on a case-by-case basis by simply granting an upward adjustment to a level not materially different from the rents charged for comparable unassisted units. In effect, Section 888.204 does not oblige HUD, or the project owner, to react to a comparability disparity in a particular way. Under Section 888.204, HUD will "consider" addressing a comparability disparity by changing the AAAFs, but under the "Overall Limitation" provision, HUD is obliged to address the disparity so as to avoid material differences between the rents charged for assisted and comparable unassisted units. Section 888.204 does not prohibit HUD from addressing the problem on a case-by-case basis.

■ Next, defendant contends in the alternative that Count II of plaintiff's complaint is barred by the statute of limitations which obliges the filing of a claim "within six years after such claim first accrues." 28 U.S.C. § 2501. Defendant categorizes the government action in dispute here, in effect, as the use of AAAFs rather than comparability studies when calculating rent increases. Defendant then argues that the pertinent claims first accrued when HUD took such action on the one-year anniversary date of the HAP contract, June 1, 1979, more than six years before the instant suit was filed on December 8, 1988.

A claim first accrues on the date "when all the events have occurred which fix the liability of the government and entitle the claimant to institute an action." *Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir. 1988). All the events necessary to fix government liability for the rent adjustments that occurred within six years of the filing of the instant action certainly did not occur by June 1, 1979. There were a myriad of necessary acts that had yet to occur. Plaintiff had a series of obligations to perform under the contract. Plaintiff had to provide apartments, including heat, light, water, and maintenance, to persons eligible for government subsidies. Defendant, in turn, had to establish, calculate, and apply the applicable AAAFs each year and the AAAF-based adjustments would have to result in rents not materially different from the rents charged for comparable unassisted units.

Stated in a different way, under the HAP contract, each year created new obligations for each party. Even assuming HUD calculated the rent for one particular year improperly, under the terms of the contract, the next year HUD would be under a separate and distinct obligation to have the new rent not materially different from the rents then charged for comparable unassisted units. In the event HUD failed to so modify the rents in a particular year, plaintiff had a new cause of action for the violation for that year.

Thus, while the statute of limitations would bar all claims based on rents paid more than six years before the filing of the instant suit, it would not bar claims based on rent determinations that occurred within the six-year statute of limitations.

### IV.

While using a somewhat different approach, Claims I and III also attack defendant's failure to set the contract rents based upon the rents charged for comparable unassisted units. At oral argument, plaintiff explained, in effect, that Claims I, II, and III were intended as variations on a single theme and were not intended to raise any significantly different legal theories. But, as the court explained at oral argument, differences do exist between Claim II and Claims I and III, and Claims I and III potentially can raise legal issues that did not have to be resolved above when the court addressed Claim II. The parties' respective briefs deal mainly with the broad issues discussed above with respect to Claim II but do not focus sufficiently on the differences between Claim II and Claims I and III. Without such focused briefing, this court is hesitant to address Claims I and III. Moreover, the court's upholding of the legal theory behind Claim II may render Claims I and III duplicative from plaintiff's perspective. In this con-

text, the court will deny the parties' respective summary judgment motions concerning Claims I and III, without prejudice to refiling. Any subsequent motions should focus on the pertinent distinctions between the claims.

At oral argument, the court and the parties discussed in detail Claims IV and V. For the reasons explained therein, the court denies the parties' respective motions for summary judgment regarding these claims without prejudice to refiling at some future time.

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment on Count II of plaintiff's complaint is granted to the extent plaintiff seeks recovery based on rent determinations made more than six years prior to filing the instant suit. Such claims are barred by the statute of limitations. Defendant's motion for summary judgment is denied in all other respects. Plaintiff's cross-motion for partial summary judgment on Count II is granted to the extent that this court will interpret the "Overall Limitation" provision as explained above. Plaintiff's motion is denied in all other respects. On or before May 14, 1992, the parties shall file a status report, jointly or separately, advising the court as to their intentions with respect to further proceedings in this action.

IT IS SO ORDERED.